Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/22/2017 08:10 PM CST

Patrick O'Brien, appellant, and Suburban Air Freight, Inc.,
and Liberty Mutual Insurance Company, appellees,
v. Cessna Aircraft Company and Goodrich
Aerospace Company, appellees.

___ N.W.2d ___

Filed November 3, 2017.    No. S-15-1212.

1. **Products Liability.** The central question in any claim based on strict liability in tort is whether the product was defective.
2. ____. Defects usually fall into one of three categories: design defects, manufacturing defects, or warning defects.
3. **Products Liability: Expert Witnesses: Circumstantial Evidence: Proof.** The best means of proving a defect is expert testimony pointing to a specific defect. But in lieu of pleading and proving a specific defect, plaintiffs have been permitted to prove an unspecified defect in the warranted product through circumstantial evidence using what is commonly referred to as the "malfunction theory."
4. **Products Liability: Proof.** Under the malfunction theory, also sometimes called the indeterminate defect theory or general defect theory, a plaintiff may prove a product defect circumstantially, without proof of a specific defect, when (1) the incident causing the harm was of a kind that would ordinarily occur only as the result of a product defect and (2) the incident was not, in the particular case, solely the result of causes other than a product defect existing at the time of sale or distribution.
5. ____: ____. The malfunction theory, which permits a plaintiff to prove a product defect circumstantially without proof of any specific defect, is not available when specific defects are alleged.
6. **Pretrial Procedure: Appeal and Error.** Decisions regarding discovery are directed to the discretion of the trial court, and will be upheld in the absence of an abuse of discretion.
7. **Pretrial Procedure: Proof: Appeal and Error.** The party asserting error in a discovery ruling bears the burden of showing that the ruling was an abuse of discretion.

8. **Judgments: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

9. **Trial: Evidence: Appeal and Error.** A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.

10. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection or exclude evidence on hearsay grounds.

11. **Evidence: Appeal and Error.** In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.

12. **Trial: Evidence: Appeal and Error.** Because authentication rulings are necessarily fact specific, a trial court has discretion to determine whether evidence has been properly authenticated. An appellate court reviews the trial court's ruling on authentication for abuse of discretion.

13. **Judgments: Words and Phrases: Appeal and Error.** An abuse of discretion, warranting reversal of a trial court's evidentiary decision on appeal, occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

14. **Products Liability: Proof.** A plaintiff in a strict liability case may rely on evidence of other similar accidents involving the product to prove defectiveness, but the plaintiff must first establish that there is a substantial similarity of conditions between the other accidents and the accident that injured the plaintiff.

15. **Products Liability: Proof: Notice.** In a strict liability case, the proponent of the evidence bears the burden to establish the similarity between the other accidents and the accident at issue before the evidence is admitted. The proffered evidence must satisfy the substantial similarity test for it to be properly admitted into evidence, whether to prove defect, causation, or knowledge/notice. Substantial similarity is satisfied when the prior accidents or occurrences happened under substantially the same circumstances and were caused by the same or similar defects and dangers.

16. **Trial: Evidence: Appeal and Error.** The exclusion of evidence is ordinarily not prejudicial where substantially similar evidence is admitted without objection.

17. **Trial: Evidence: Testimony.** Where the information contained in an exhibit is, for the most part, already in evidence from the testimony of witnesses, the exclusion of the exhibit is not prejudicial.

18. **Trial: Evidence: Juries.** A motion in limine is only a procedural step to prevent prejudicial evidence from reaching the jury. It is not the office of such motion to obtain a final ruling upon the ultimate admissibility of the evidence.

19. **Trial: Evidence: Proof: Appeal and Error.** Because overruling a motion in limine is not a final ruling on the admissibility of evidence and does not present a question for appellate review, a question concerning the admissibility of evidence which is the subject of a motion in limine must be raised and preserved for appellate review by an appropriate objection or offer of proof during trial.

20. **Rules of Evidence.** Authentication or identification of evidence is a condition precedent to its admission and is satisfied by evidence sufficient to prove that the evidence is what the proponent claims.

21. **Trial: Evidence.** A court must determine whether there is sufficient foundation evidence for the admission of physical evidence on a case-by-case basis.

22. **Rules of Evidence: Proof.** Neb. Rev. Stat. § 27-901 (Reissue 2016) lists, by way of illustration, 10 means of adequately authenticating a document.

23. **Pleadings: Evidence: Waiver: Words and Phrases.** A judicial admission is a formal act done in the course of judicial proceedings which is a substitute for evidence, thereby waiving or dispensing with the production of evidence by conceding for the purpose of litigation that the proposition of fact alleged by the opponent is true.

24. **Pleadings: Evidence.** Similar to a stipulation, a judicial admission must be unequivocal, deliberate, and clear.

25. **Rules of Evidence: Hearsay.** Hearsay is not admissible except as provided by the Nebraska Evidence Rules.

26. **Rules of Evidence: Hearsay: Proof.** The party seeking to admit a business record under Neb. Rev. Stat. § 27-803(5)(a) (Reissue 2016) bears the burden of establishing foundation under a three-part test. First, the proponent must establish that the activity recorded is of a type that regularly occurs in the course of the business' day-to-day activities. Second, the proponent must establish that the record was made as part of a regular business practice at or near the time of the event recorded. Third, the proponent must authenticate the record by a custodian or other qualified witness.

27. **Trial: Witnesses: Proof.** In order to predicate error upon a ruling of the court refusing to permit a witness to testify, or to answer a specific

question, the record must show an offer to prove the facts sought to be elicited.

28. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

29. **Jurisdiction: States.** When there are no factual disputes regarding state contacts, conflict-of-law issues present questions of law.

30. **Judgments: Appeal and Error.** When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court.

31. **Courts: Jurisdiction: States.** In answering any choice-of-law question, a court first asks whether there is any real conflict between the laws of the states.

32. **Jurisdiction: States.** An actual conflict of law exists when a legal issue is resolved differently under the law of two states.

33. **Constitutional Law: Damages: Penalties and Forfeitures.** Under Nebraska law, punitive, vindictive, or exemplary damages contravene Neb. Const. art. VII, § 5, and thus are not allowed in this jurisdiction.

34. **Jurisdiction: States: Contracts: Torts.** Once a court determines there is a conflict of law between two states, the next step is to classify the nature of the specific conflict issue, because different choice-of-law rules apply depending on whether the cause of action sounds in contract or in tort.

35. **Torts: Appeal and Error.** To resolve conflicts of law involving tort liability, the Nebraska Supreme Court consistently has applied the Restatement (Second) of Conflict of Laws § 146 (1971).

36. **Jury Instructions.** Whether the jury instructions given by a trial court are correct is a question of law.

37. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's failure to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the tendered instruction.

38. **Jury Instructions: Appeal and Error.** Jury instructions do not constitute prejudicial error if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and evidence.

39. **Trial: Jury Instructions: Negligence.** A trial court is not required to submit repetitive allegations of the same act of negligence.

40. **Torts: Jury Instructions.** The Nebraska Supreme Court has consistently condemned the practice of instructing the jury in haec verba and, instead, has placed the duty squarely upon the trial court to properly analyze, summarize, and submit the substance of the numerous allegations of negligence in tort petitions.

41. **Costs: Appeal and Error.** The decision of a trial court regarding taxing of costs is reviewed for an abuse of discretion.

42. **Costs.** The costs of litigation and expenses incident to litigation may not be recovered unless provided by statute or a uniform course of procedure.

43. **Torts: Costs.** Under Neb. Rev. Stat. § 25-1710 (Reissue 2016), a successful defendant in a tort action is ordinarily entitled to an award of costs as a matter of course upon a judgment in his or her favor.

44. **Depositions: Costs.** Deposition costs are properly taxable and recoverable under Neb. Rev. Stat. § 25-1710 (Reissue 2016).

45. ____: ____. Unless it appears that the depositions were not taken in good faith or were actually unnecessary, costs of taking them are properly taxable under Neb. Rev. Stat. § 25-1710 (Reissue 2016), even if the depositions were not used at trial. The questions of good faith and reasonable necessity are for the trial court to determine.

Appeal from the District Court for Douglas County: LEIGH ANN RETELSDORF, Judge. Affirmed.

Arthur A. Wolk, Bradley J. Stoll, and Cynthia M. Devers, of Wolk Law Firm, David A. Domina, of Domina Law Group, P.C., L.L.O., and Robert W. Mullin, of Houghton, Bradford & Whitted, P.C., L.L.O., for appellant.

John C. Nettels, Jr., and Robin K. Carlson, of Stinson, Leonard & Street, L.L.P., and Bryan S. Hatch, of Likes, Meyerson & Hatch, L.L.C., for appellee Cessna Aircraft Company.

Elizabeth B. Wright and Andrew H. Cox, of Thompson Hine, L.L.P., and William R. Johnson and Brian J. Brislen, of Lamson, Dugan & Murray, L.L.P., for appellee Goodrich Aerospace Company.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, KELCH, and FUNKE, JJ.

STACY, J.

## I. NATURE OF CASE

This tort action was filed by a pilot who was injured when the plane he was flying crashed on approach to the airport in Alliance, Nebraska. After a 4-week trial, the jury returned a general verdict for the defendants. The pilot appeals, asserting 65 assignments of error. We affirm the judgment of the district court.

## II. BACKGROUND

Patrick O'Brien was employed as a commercial pilot flying mail overnight between Alliance, North Platte, and Omaha, Nebraska. In February 2007, he was seriously injured when the Cessna 208B Caravan he was flying crashed through the roof of a metal building and into a utility pole during a non-precision approach to the Alliance airport. The impact occurred at approximately 2:25 a.m. in heavy fog and below freezing temperatures; night instrument meteorological conditions prevailed. O'Brien has no memory of the crash or any of his actions before the crash. He theorizes that ice accumulated on the aircraft during flight, resulting in an "ice contaminated tail stall" (ICTS) that caused the crash.

O'Brien sued the aircraft's designer and manufacturer, Cessna Aircraft Company (Cessna), as well as the designer and manufacturer of the aircraft's pneumatic deicing system, Goodrich Aerospace Company (Goodrich), asserting claims of strict liability, negligence, and fraudulent misrepresentation. Cessna and Goodrich denied O'Brien's claims and alleged the accident was the result of O'Brien's negligent operation and misuse of the aircraft.

The case was tried to a jury over a period of 4 weeks. The jury returned a general verdict for the defendants, finding O'Brien had not met his burden of proof on any of his claims. Rather than detail all of the evidence offered at trial, we summarize the evidence and set out the general theories advanced by the parties.

## 1. CESSNA 208B CARAVAN

At the time of the crash, O'Brien was flying a Cessna 208B Caravan (hereinafter Model 208B) owned and maintained by his employer. The Model 208B is a single-engine, turboprop, high-wing airplane. The Model 208B was certified by the Federal Aviation Administration (FAA) for "Flight Into Known Icing Conditions." To obtain this certification, an aircraft designer must show that the aircraft can operate safely in icing conditions. The Model 208B that O'Brien was flying was configured for such conditions and to carry cargo.

The Model 208B was designed with pneumatic deicing "boots," and the aircraft O'Brien was flying was equipped with such boots. This deicing system uses hot "bleed air" from the aircraft's engine to inflate corrugated rubberlike boots affixed to multiple parts of the aircraft. As the boots inflate and expand, accumulated ice is broken up and shed. The deicing boots are manually activated by the pilot using a switch in the cockpit.

When Cessna was designing the Caravan models, it considered several different ice-protection systems, including TKS. TKS is an anti-icing system that extrudes an alcohol/glycol-based fluid through a thin mesh to prevent ice from forming. Cessna had used a TKS system on a different plane model, but chose to use pneumatic deicing boots for the Caravan models, including the Model 208B.

## 2. O'BRIEN'S THEORY

O'Brien's experts testified that his aircraft suffered ICTS while flying through light-to-moderate icing conditions. Accident scene photographs taken a few hours after the crash, supported by testimony at trial, showed ice accumulation of anywhere from one-tenth to one-fourth of an inch of ice on the leading edge of the wings, and approximately one-eighth of an inch of ice on the horizontal tail. Witnesses testified that the horizontal tail keeps the aircraft balanced in flight by creating a downward lift and preventing the nose of the aircraft from pitching down. Generally speaking, when

enough ice accumulates on the horizontal tail to disrupt the downward lift, ICTS can occur and the tail cannot keep the aircraft upright.

O'Brien cited various design defects in the Model 208B and its pneumatic deicing system that he claimed caused his aircraft to suffer ICTS. Specifically, he claimed the deicing system on the Model 208B was defectively designed and unreasonably dangerous in that the deicing boots provided insufficient coverage and the deicing system lacked a water separator to prevent contaminants from entering and affecting its operation.

O'Brien also claimed the crash was caused by the negligence of Cessna and Goodrich in selecting, designing, and testing the deicing system. He claimed, summarized, they were negligent in selecting pneumatic deicing boots rather than a TKS anti-icing system for the Caravan models, in failing to install a water separator for the deicing boots, in failing to provide a filter for the bleed air system, in failing to provide boots with adequate coverage for the conditions in which the aircraft would be flown, in failing to properly test the Model 208B for flight in icing conditions, in failing to warn operators and owners that the Model 208B was unsuitable for operating in icing conditions and suffers ICTS, and in failing to provide adequate instructions for operating the aircraft in icing conditions.

O'Brien also claimed Cessna fraudulently misrepresented that if the Model 208B was operated in accordance with the "Pilots Operating Handbook and FAA Approved Airplane Flight Manual," it was safe to fly in icing conditions, when it knew it was not. O'Brien alleged he relied on this false representation, which proximately caused his crash and injuries.

### 3. Theory of Cessna and Goodrich

Cessna and Goodrich claimed there was no credible evidence that O'Brien's aircraft experienced ICTS and suggested the crash was caused by O'Brien's own negligence in descending

below the minimum descent altitude before he had the runway environment in sight. Defense experts testified that the crash resulted from "controlled flight into terrain" caused by O'Brien's inadvertent descent below the minimum descent altitude, at night, in a single-pilot environment, due to distraction and heavy fog.

To counter evidence that the aircraft experienced a tail stall, the defense offered evidence that O'Brien's vertical and horizontal flight path, although below the minimum descent altitude, appeared to be under control and lined up with the runway. Additionally, the defense suggested the aircraft's 4-degree angle of impact into the metal building and the similar angle of the aircraft's path through the roof of the building indicated the aircraft was under O'Brien's control at the time of impact.

Cessna and Goodrich denied that the crash was caused by any malfunction or defect in the pneumatic deicing boots. They presented evidence that the weather conditions would not have required activation of the deicing boots, and they offered circumstantial evidence that O'Brien had not cycled the boots before the crash.

Cessna's expert testified that the pilots operating handbook indicates a pilot should cycle the boots as a matter of course immediately before landing and, depending on the type of ice, whenever one-fourth to three-fourths of an inch of ice has accumulated on the wing's leading edge. O'Brien has no memory of using the deicing boots before the crash, but testified it was his usual practice to wait until at least one-half of an inch of ice had accumulated on the wing's leading edge before activating the boots. A defense expert performed an ice accretion analysis using the weather data supplied by O'Brien's weather expert and determined that approximately one-tenth of an inch of ice would have accumulated on the wings' leading edges before the crash. The defense also relied on accident scene photographs showing that the protected surfaces of the plane had approximately one-tenth of an inch

of ice, and roughly the same amount of ice was found on the unprotected surfaces, suggesting O'Brien had not cycled the boots before impact.

### 4. JURY VERDICT AND APPEAL

The case was submitted to the jury on O'Brien's claims of negligence and strict liability against both Cessna and Goodrich, and on O'Brien's claim of fraudulent misrepresentation against Cessna. The jury deliberated for approximately 8 hours before returning a general verdict for the defendants. The district court accepted the verdict, entered judgment thereon for the defendants, and directed O'Brien to pay the costs of the action. After an evidentiary hearing on costs, the court found O'Brien should be ordered to pay costs in the amount of $35,701.68 and entered judgment accordingly. O'Brien timely appealed.

## III. ASSIGNMENTS OF ERROR

O'Brien assigns 65 errors, which we condense into 10. O'Brien assigns, renumbered and restated, that the district court erred in (1) excluding the testimony of his expert regarding 32 "substantially similar" plane crashes; (2) failing to enforce its discovery order compelling Cessna to produce flight test data; (3) excluding as hearsay a copy of a 2006 Airworthiness Directive affecting the Caravan models; (4) excluding exhibits showing Cessna concealed information regarding the "Caravan's susceptibility to ICTS"; (5) excluding evidence that after the crash, Cessna changed the design of the Caravan models from one which used pneumatic deicing boots to one which used an anti-icing system; (6) excluding multiple documents Goodrich marked as "confidential"; (7) excluding the opinion testimony of O'Brien's radar reconstruction expert; (8) concluding that Nebraska law applied to the issue of punitive damages rather than Kansas law; (9) refusing to instruct the jury using O'Brien's tendered instruction; and (10) taxing excessive costs to O'Brien.

## IV. ANALYSIS

### 1. O'Brien Cannot Rely on Malfunction Theory to Infer Unspecified Defect

In addition to presenting evidence of specific design defects in the deicing system of the Model 208B, O'Brien sought to present circumstantial evidence that the Model 208B was defective because it was "susceptible to ICTS." Many of O'Brien's assignments of error include the argument that he was prevented from showing the Model 208B was "susceptible to ICTS" or had a "propensity to suffer ICTS."[1]

Both before the district court and on appeal, Cessna argued that O'Brien's "susceptibility theory" identifies no specific defect and "is so vague as to be meaningless."[2] The trial court did not instruct the jury on O'Brien's "susceptibility theory," reasoning in part that it had not been sufficiently pled. Because so many of O'Brien's assigned errors include the argument that he should have been permitted to show that the Model 208B was "susceptible to ICTS," we address the viability of this theory as a threshold matter.

[1-4] The central question in any claim based on strict liability in tort is whether the product was defective.[3] Defects usually fall into one of three categories: design defects, manufacturing defects, or warning defects.[4] The best means of proving a defect is expert testimony pointing to a specific defect.[5] But in lieu of pleading and proving a specific defect, we have—at least in the context of an implied warranty case—permitted plaintiffs to prove an *unspecified* defect in the warranted product through circumstantial evidence using what is

---

[1] E.g., replacement brief for appellant at 26.

[2] Brief for appellee Cessna at 21.

[3] See, *Roskop Dairy v. GEA Farm Tech.*, 292 Neb. 148, 871 N.W.2d 776 (2015); *Stahlecker v. Ford Motor Co.*, 266 Neb. 601, 667 N.W.2d 244 (2003).

[4] *Roskop Dairy v. GEA Farm Tech., supra* note 3.

[5] *Genetti v. Caterpillar*, 261 Neb. 98, 621 N.W.2d 529 (2001).

commonly referred to as the "malfunction theory."[6] We have described the rationale and application of the malfunction theory as follows:

> The malfunction theory is based on the same principle underlying res ipsa loquitur, which permits a fact finder to infer negligence from the circumstances of the incident, without resort to direct evidence of the wrongful act.
>
> Under the malfunction theory, also sometimes called the indeterminate defect theory or general defect theory, a plaintiff may prove a product defect circumstantially, without proof of a specific defect, when (1) the incident causing the harm was of a kind that would ordinarily occur only as the result of a product defect and (2) the incident was not, in the particular case, solely the result of causes other than a product defect existing at the time of sale or distribution.[7]

This court has addressed the natural limitations of the malfunction theory and emphasized it should be applied with caution:

> The malfunction theory should be utilized with the utmost of caution. Although some circumstances may justify the use of the malfunction theory to bridge the gap caused by missing evidence, the absence of evidence does not make a fact more probable but merely lightens the plaintiff's evidentiary burden despite the fact that the missing evidence might well have gone either way, and this rationale is too often subject to misapplication by courts in situations in which evidence is actually available.
>
> . . . .
>
> The malfunction theory is narrow in scope. The malfunction theory simply provides that it is not necessary for the plaintiff to establish a specific defect so

---

[6] *Roskop Dairy v. GEA Farm Tech., supra* note 3.

[7] *Id.* at 174, 871 N.W.2d at 796.

long as there is evidence of some unspecified dangerous condition or malfunction from which a defect can be inferred—the malfunction itself is circumstantial evidence of a defective condition. The malfunction theory does not alter the basic elements of the plaintiff's burden of proof and is not a means to prove proximate cause or damages.[8]

We understand O'Brien's argument that the Cessna Caravan models are "susceptible to ICTS" as an attempt to prove an unspecified or general defect in the aircraft through circumstantial evidence. This court has not extended the malfunction theory into the context of strict liability product defect claims.[9] Assuming without deciding the theory can be used in a strict liability case, it is unavailable to O'Brien here for two reasons: (1) He did not plead such a theory and (2) the applicability of such a theory is negated by his assertion of specific defects.

A plaintiff who wishes to rely on the malfunction theory to establish an unspecified defect must plead and prove that (1) the incident causing the harm was of a kind that would ordinarily occur only as the result of a product defect and (2) the incident was not, in the particular case, solely the result of causes other than a product defect existing at the time of sale or distribution.[10] O'Brien's amended complaint included no such allegations and, instead, identified a myriad of very specific design defects that allegedly caused the aircraft to crash. Given the nature of the crash, it is doubtful O'Brien could satisfy either factor of the malfunction theory, but his failure to plead the malfunction theory at all prevents him from relying on it to prove a nonspecific defect that the aircraft was "susceptible to ICTS."

---

[8] *Id*. at 174-75, 871 N.W.2d at 796-97.

[9] See *Shuck v. CNH America, LLC*, 498 F.3d 868 (8th Cir. 2007) (discussing Nebraska law on strict liability product defect claims).

[10] *Roskop Dairy v. GEA Farm Tech., supra* note 3.

More importantly, in a case such as this where the plaintiff pleads specific defects, the malfunction theory is simply unavailable. As we observed recently:

> [W]e have found little case law specifically addressing whether the malfunction theory applies when there is no loss of evidence or when there is an allegation of a specific defect, [but] we find no cases that have done so. And we observe that the related doctrine of res ipsa loquitur does not apply when specific acts of negligence are alleged or there is evidence of the precise cause of the accident.[11]

[5] We now expressly hold what we previously observed: The malfunction theory, which permits a plaintiff to prove a product defect circumstantially without proof of any specific defect, is not available when specific defects are alleged. A plaintiff cannot simultaneously rely on the malfunction theory to establish an unspecified defect and, at the same time, point to evidence of specific defects.

As such, to the extent O'Brien has assigned error to various trial court rulings excluding evidence related to the general theory that the Cessna Caravan models are "susceptible to ICTS," all such assignments are without merit and warrant no additional discussion.

## 2. DISCOVERY RULING

O'Brien assigns that the district court erred in failing to enforce a discovery order. His argument relates to two separate discovery rulings; O'Brien asserts the first discovery ruling was erroneous and the second ruling illustrates how he was prejudiced. We summarize both discovery rulings below and find no abuse of discretion.

### (a) Standard of Review

[6,7] Decisions regarding discovery are directed to the discretion of the trial court, and will be upheld in the absence of

---

[11] *Id*. at 179, 871 N.W.2d at 799.

an abuse of discretion.[12] The party asserting error in a discovery ruling bears the burden of showing that the ruling was an abuse of discretion.[13]

### (b) Discovery Rulings

Early in the case, O'Brien asked Cessna to produce all the data which was recorded on the flight data recording equipment on board aircraft "N208LP," which number is the FAA registration number assigned to one of the prototypes of Cessna's Caravan models. The requested flight test data was stored on magnetic tapes onto which Cessna had recorded raw telemetry data from Caravan test flights in the 1980's. The court ordered production of the magnetic tapes, and Cessna copied the raw data from the magnetic tapes and produced it to O'Brien.

O'Brien then moved for an order compelling Cessna to convert the raw flight test data into a different format and moved for sanctions. The court overruled O'Brien's motion, including the request for sanctions, but it ordered Cessna to produce a compact disc of flight test data that had been converted for use by Cessna's expert. The court also invited O'Brien's counsel to bring the matter back before the court if he believed additional converted flight test data existed. And while the court did not require Cessna to convert all of the raw flight test data into a different format, it did not foreclose the possibility of such an order in the future, explaining:

> The Court declines to order Cessna to convert all raw flight test data into readable format at this time. Instead, Cessna will produce a recently located CD containing flight test data. Once [O'Brien has] had an opportunity to review the CD, [he] may request a hearing or further telephone conference, if needed.

The record does not show that O'Brien followed up with either Cessna or the district court on this issue.

---

[12] *Moreno v. City of Gering*, 293 Neb. 320, 878 N.W.2d 529 (2016); *Breci v. St. Paul Mercury Ins. Co.*, 288 Neb. 626, 849 N.W.2d 523 (2014).

[13] *Id.*

Later, after the deadline for completing expert discovery passed, Cessna moved to exclude the testimony of one of O'Brien's experts on the ground O'Brien had not produced his expert for deposition despite repeated requests from Cessna. In response, O'Brien claimed his expert was not able to complete his work because he had not seen the disputed Cessna flight test data. The district court sustained Cessna's motion to limit the expert's testimony, but advised counsel it would reconsider its decision if O'Brien could show that Cessna's delay in producing the flight test data had, in fact, delayed O'Brien's expert's work. The record does not show that O'Brien took any further action on the issue.

On appeal, O'Brien assigns that the district court erred by failing to enforce its order compelling Cessna to produce flight test data. He contends he was "deprived" of converted flight test data because the "court failed to enforce its order" compelling discovery. O'Brien claims he was prejudiced because his expert witnesses needed the converted data to, among other things, prove "ICTS susceptibility."

(c) No Abuse of Discretion

To put this particular discovery dispute in context, we note the trial court heard and ruled upon at least 40 motions regarding various discovery issues. In regard to the discovery dispute over converting the raw flight test data, O'Brien argues on appeal that the trial court "fail[ed] to assure disclosure"[14] of the data by imposing discovery sanctions. We see nothing in the record that suggests the court abused its discretion on this issue.

[8] A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[15] Here, the court initially

---

[14] Replacement brief for appellant at 43.

[15] *Hill v. Tevogt*, 293 Neb. 429, 879 N.W.2d 369 (2016).

ordered Cessna to produce the raw flight test data, and Cessna complied. When O'Brien later asked that Cessna be ordered to convert all the flight test data into a different format, the court conditionally denied the motion, but ordered Cessna to turn over the flight test data that already had been converted and invited O'Brien's counsel to request further hearing on the issue once it had an opportunity to review that information. O'Brien's trial counsel took no further action. We cannot construe counsel's failure to follow up on the court's invitation as an abuse of discretion by the trial court.

### 3. Evidentiary Rulings

O'Brien assigns error to many of the trial court's evidentiary rulings. We address each in turn, but first we set out the standards by which we review such rulings on appeal.

### (a) Standard of Review

[9] A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.[16]

[10] Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection or exclude evidence on hearsay grounds.[17]

[11] In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.[18]

[12] Because authentication rulings are necessarily fact specific, a trial court has discretion to determine whether

---

[16] *Hartley v. Metropolitan Util. Dist.*, 294 Neb. 870, 885 N.W.2d 675 (2016).

[17] *Arens v. NEBCO, Inc.*, 291 Neb. 834, 870 N.W.2d 1 (2015).

[18] *Hartley v. Metropolitan Util. Dist., supra* note 16.

evidence has been properly authenticated.[19] An appellate court reviews the trial court's ruling on authentication for abuse of discretion.[20]

[13] An abuse of discretion, warranting reversal of a trial court's evidentiary decision on appeal, occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[21]

#### (b) Evidence of Other Accidents

Cessna moved in limine to prevent O'Brien's expert from testifying about 32 accidents involving other Model 208B aircraft. After a 3-day hearing during which the court received testimony and exhibits regarding each of the other accidents, the court excluded evidence of the other accidents, finding O'Brien had failed to meet his burden of proving substantial similarity between the other accidents and O'Brien's accident. O'Brien assigns this as error.

[14,15] A plaintiff in a strict liability case may rely on evidence of other similar accidents involving the product to prove defectiveness, but the plaintiff must first establish that there is a substantial similarity of conditions between the other accidents and the accident that injured the plaintiff.[22] The proponent of the evidence bears the burden to establish the similarity between the other accidents and the accident at issue before the evidence is admitted.[23] The proffered evidence must satisfy the substantial similarity test for it to be properly admitted into evidence, whether to prove defect, causation, or knowledge/notice.[24] Substantial similarity is satisfied when

---

[19] *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016).

[20] *Id.*

[21] *Id.*

[22] *Shipler v. General Motors Corp.*, 271 Neb. 194, 710 N.W.2d 807 (2006).

[23] *Id.*

[24] *Id.*

"the prior accidents or occurrences happened under substantially the same circumstances and were caused by the same or similar defects and dangers."[25]

Here, the court summarized the circumstances of O'Brien's accident and the specific design defects he alleged and then compared it to the evidence adduced regarding the 32 other accidents. The court found the other accidents spanned from 1990 to the present, and while all involved flying in ice, sleet, or snow, most did not involve evidence that the pilot had activated the deicing boots, as O'Brien alleged to have done. Some accidents involved planes that crashed during landing, while others involved crashes during takeoff. Still others involved an aircraft that landed safely or sustained minimal damage. After comparing the evidence, the court concluded that none of the 32 other accidents were substantially similar to O'Brien's, explaining:

> These accidents occurred under entirely different circumstances; including different points of significance during the flights, pilots of different experience levels, different airport geography and topography, different weather conditions (some conditions outside of those under which the aircraft is actually certified to fly), and under circumstances that required different investigating agencies coming to different factual and causation conclusions from [O'Brien's] proposed expert opinions on causation.

O'Brien does not take exception to any of these findings. Instead, he suggests the trial court failed to recognize that he offered evidence of the other accidents not just to prove the specific defects he had alleged, but also as circumstantial evidence that the aircraft was "susceptible to ICTS."[26] O'Brien suggests that despite the dissimilarities noted by the court, the prior accidents "are compelling proof" that the Model 208B is generally "unsafe in icing conditions because of its

---

[25] *Id*. at 223, 710 N.W.2d at 834.

[26] Replacement brief for appellant at 27.

design,"[27] and he argues the other accidents should have been admitted for that purpose. We conclude the trial court not only recognized O'Brien's argument in this regard, but correctly rejected it.

As explained earlier, O'Brien alleged his accident was caused by several specific design defects and, consequently, he cannot simultaneously rely on the malfunction theory in an effort to prove the accident was caused by a nonspecific defect rendering the aircraft "susceptible to ICTS." The trial court correctly considered the admissibility of the 32 other accidents by comparing them to the circumstances surrounding O'Brien's accident and the specific defects he alleged, and focusing on whether "the prior accidents or occurrences happened under substantially the same circumstances and were caused by the same or similar defects and dangers."[28]

On this record, we find no abuse of discretion in the court's decision to exclude evidence of the 32 prior accidents. "[W]here an individual fails to adequately demonstrate how prior occurrences are substantially similar, evidence of prior occurrences is irrelevant and, thus, inadmissible."[29]

### (c) FAA Airworthiness Directive

In 2006, the FAA issued "Airworthiness Directive 2006-06-06" (AD) affecting all "Cessna Model 208 airplanes and Model 208B airplanes" equipped with pneumatic deicing boots that were "not currently prohibited from flight in known or forecast icing." The AD required that certain information be inserted into the flight manual, inserted into the pilots operating handbook, and placed on instrument panel placards to inform pilots that the aircraft could dispatch into forecast areas of icing, but if pilots encountered "moderate or greater icing conditions," they were prohibited from continued flight

---

[27] *Id*. at 28.

[28] *Shipler v. General Motors Corp., supra* note 22, 271 Neb. at 223, 710 N.W.2d at 834.

[29] *Holden v. Wal-Mart Stores*, 259 Neb. 78, 85, 608 N.W.2d 187, 193 (2000).

and had to immediately exit such conditions. The AD included regulatory language explaining how to comply with the FAA's directive and summarized several "accident/incidents" that prompted the FAA to issue the AD.

At trial, there was considerable testimony regarding the AD. The jury heard testimony about when and why the AD was issued, what it required, how it impacted the certification and operation of the Model 208B in moderate icing conditions, and the actions taken to comply with the AD. But the court did not receive a copy of the AD into evidence, finding it contained inadmissible hearsay and was more prejudicial than probative.

On appeal, O'Brien asserts it was reversible error to exclude the AD as an exhibit. He argues the AD was admissible, because it either fell within one of several hearsay exceptions or was offered for a nonhearsay purpose. He also argues it was an agency ruling subject to judicial notice under Neb. Rev. Stat. § 27-201 (Reissue 2016). We do not reach the merits of these evidentiary arguments, because we conclude even if error could be shown, it would not warrant reversal on this record because O'Brien cannot show the requisite prejudice.

[16,17] In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.[30] The exclusion of evidence is ordinarily not prejudicial where substantially similar evidence is admitted without objection.[31] In particular, where the information contained in an exhibit is, for the most part, already in evidence from the testimony of witnesses, the exclusion of the exhibit is not prejudicial.[32]

Here, the relevant information contained within the AD was presented to the jury through witness testimony. O'Brien's

---

[30] *Steinhausen v. HomeServices of Neb.*, 289 Neb. 927, 857 N.W.2d 816 (2015).

[31] *Id.*

[32] *Id.*

closing argument focused extensively on that testimony, and his briefing articulates no way in which the presentation of O'Brien's case was unfairly constrained by the exclusion of the exhibit. Instead, O'Brien suggests that exclusion of the AD exhibit was prejudicial, because it was the "only document the jury asked to see during deliberations."[33]

During deliberation, the foreperson sent a question to the court asking: "Is [the AD] in evidence? If so, we can not [sic] locate our copy. Could you provide it to us? (Or is it demonstrative?)" Before responding to the jurors' question, the court consulted with counsel. O'Brien's attorney pointed out that the jury "heard all about" the AD and that "witnesses discussed it in excruciating detail," so he took the position that the jury either should be provided a copy of the exhibit, even though it was not in evidence, or should be instructed that "[y]our recollection of its contents should be controlling." The court rejected both suggestions. Instead, the court responded to the jury's question as follows: "The Court received testimony about the [AD], but the document itself was not received as an exhibit . . . ."

O'Brien does not assign error to the court's response, but argues that the jury's interest in reviewing the AD shows he was prejudiced by its exclusion. We disagree.

Thousands of exhibits were marked in this case, and given the amount of testimony and argument focused on the AD, we find nothing unusual about the jury's asking whether a copy of the AD was in evidence. O'Brien's statement to the trial court that the jury "heard all about" the AD and "witnesses discussed it in excruciating detail" is supported by the record and directly contradicts the position he takes on appeal. Moreover, nothing about the jury's question, or the court's response, supports O'Brien's argument that excluding a copy of the AD unfairly prejudiced a substantial right. This assignment is without merit.

_____

[33] Reply brief for appellant at 8.

### (d) FAA and National Transportation
### Safety Board Documents

O'Brien assigns error to the exclusion of 12 exhibits related to safety investigations conducted by the FAA and the National Transportation Safety Board. The FAA exhibits include various directives, bulletins, briefing papers, and letters. The National Transportation Safety Board's exhibits include safety recommendations, a listing of the board's "Most Wanted Transportation Safety Improvements," and a PowerPoint presentation assessing icing incidents involving the Model 208B. In response to a motion in limine, some of those exhibits were excluded on hearsay grounds, and others were excluded on grounds the exhibit was either irrelevant or more prejudicial than probative. At trial, O'Brien made an offer of proof concerning the excluded exhibits and the court affirmed its preliminary rulings and excluded the exhibits.

O'Brien's briefing combines his argument regarding all 12 exhibits. With respect to the exhibits excluded as hearsay, O'Brien argues they were not being offered for their truth and alternatively argues they should have been admitted under the residual hearsay exception.[34] With respect to the exhibits excluded as irrelevant or unfairly prejudicial, O'Brien argues the trial court should have required more proof that the unfair prejudice outweighed the exhibits' probative value.

We find it unnecessary to discuss the merits of O'Brien's evidentiary arguments, because we conclude that even if some error could be shown, O'Brien cannot show that the exclusion of these exhibits unfairly prejudiced a substantial right.[35]

O'Brien claims he offered these exhibits to establish "the Caravan's susceptibility to ICTS" and Cessna's efforts to conceal that susceptibility. He argues the exhibits were relevant

---

[34] See Neb. Rev. Stat. § 27-804(2)(e) (Reissue 2016).

[35] See *Steinhausen v. HomeServices of Neb., supra* note 30 (holding that exclusion of evidence in civil case was not reversible error unless it unfairly prejudiced substantial right of complaining party).

to show that "the Caravan suffered unknown design flaws making it unsafe to fly" in icing conditions and that "Cessna knew the Caravan was susceptible to ICTS and concealed that knowledge."[36] But as noted previously, O'Brien's argument that the Model 208B is "susceptible to ICTS" is an attempt to prove an unspecified or general defect in the aircraft through circumstantial evidence. And O'Brien cannot rely on the malfunction theory in this case, because he did not plead it and because the malfunction theory is not available where, as here, specific defects have been alleged. As such, we conclude O'Brien cannot show he was unfairly prejudiced by the exclusion of exhibits he claims were offered to support a theory on which he could not properly rely.

### (e) Postaccident Design Change

In 2008, Cessna changed the design of its Caravan 208 series to, among other things, switch from pneumatic deicing boots to a TKS anti-icing system. Cessna moved in limine to exclude evidence of the postaccident design changes as a subsequent remedial measure under Neb. Rev. Stat. § 27-407 (Reissue 2016). The court sustained Cessna's motion, but indicated it would revisit the admissibility of the design change evidence "should conditions arise at trial that were not anticipated in the briefing." O'Brien assigns error to this ruling.

[18,19] A motion in limine is only a procedural step to prevent prejudicial evidence from reaching the jury. It is not the office of such motion to obtain a final ruling upon the ultimate admissibility of the evidence.[37] Because overruling a motion in limine is not a final ruling on the admissibility of evidence and does not present a question for appellate review, a question concerning the admissibility of evidence which is the subject of a motion in limine must be raised and preserved

---

[36] Replacement brief for appellant at 35.

[37] *State v. Schreiner*, 276 Neb. 393, 754 N.W.2d 742 (2008).

for appellate review by an appropriate objection or offer of proof during trial.[38]

O'Brien's briefing neither mentions nor cites to an offer of proof regarding evidence of the Caravan 208 series' postaccident design change. We note O'Brien made a lengthy offer of proof just before resting his case in chief, but that offer did not include evidence of the Caravan 208 series' postaccident design change. Having been cited to nowhere in the 25-volume record where O'Brien made an appropriate offer of proof regarding the postaccident design change, we conclude he failed to preserve this assigned error for appellate review.

#### (f) Documents Marked as "Confidential"

During discovery, Goodrich produced 11 documents, each marked "confidential" pursuant to a protective order entered at Goodrich's request. The protective order defined "confidential information" to mean "*bona fide* trade secret or other confidential, financial, research and development, or other information identified in good faith by the supplying party, whether it be a tangible thing, a document . . . or information revealed in an interrogatory answer or other discovery." The documents at issue include copies of emails, reports, letters, handwritten faxes, transcribed voicemail messages, and handwritten notes. When O'Brien tried to offer these documents as exhibits at trial, Goodrich objected. The trial court sustained the objections and excluded the exhibits, finding they had not been properly authenticated, lacked necessary foundation, and contained inadmissible hearsay.

On appeal, O'Brien does not separately describe the exhibits or explain why, with respect to each exhibit, the court's evidentiary rulings were erroneous. Rather, he addresses all 11 exhibits collectively, so we take the same approach.

O'Brien primarily argues that the trial court erred in ruling the exhibits had not been properly authenticated and contained

---

[38] See *id.*

hearsay. Specifically, he contends that because Goodrich produced these documents during discovery and marked them "confidential," the documents were (1) thereby authenticated under Neb. Rev. Stat. § 27-901 (Reissue 2016) and (2) excepted from the hearsay rule as business records under Neb. Rev. Stat. § 27-803(5) (Reissue 2016). The trial court correctly rejected both these contentions.

### (i) Lack of Authentication

[20,21] Authentication or identification of evidence is a condition precedent to its admission and is satisfied by evidence sufficient to prove that the evidence is what the proponent claims.[39] A court must determine whether there is sufficient foundation evidence for the admission of physical evidence on a case-by-case basis.[40] Because authentication rulings are necessarily fact specific, a trial court has discretion to determine whether evidence has been properly authenticated; we review a trial court's ruling on authentication for abuse of discretion.[41]

[22] Section 27-901 lists, by way of illustration, 10 means of adequately authenticating a document. O'Brien does not claim to have relied on any of these means to authenticate the documents at issue. Instead, he claims that Goodrich's act of marking the documents "confidential" constituted a "judicial admission of authenticity."[42] Additionally, he argues that because the documents were produced by Goodrich during discovery, they needed no further authentication. We reject both of O'Brien's authenticity arguments.

[23,24] A judicial admission is a formal act done in the course of judicial proceedings which is a substitute for

---

[39] *State v. Oldson, supra* note 19.

[40] *Id.*

[41] *Id.*

[42] Replacement brief of appellant at 38.

evidence, thereby waiving or dispensing with the production of evidence by conceding for the purpose of litigation that the proposition of fact alleged by the opponent is true.[43] Similar to a stipulation, a judicial admission must be unequivocal, deliberate, and clear.[44] By marking certain documents "confidential" in connection with producing them during discovery, Goodrich indicated nothing more than a good faith belief that the document contained "confidential information" as defined in the court's protective order. Goodrich did not thereby concede any proposition of fact alleged by O'Brien in the litigation. Identifying the documents as "confidential" did not amount to a judicial admission of the document's authenticity.

We also reject the broad proposition that producing a document during discovery alleviates a proponent's burden to lay proper foundation for the admissibility of the evidence at trial. Authentication requires more than saying "'my opponent gave me a document.'"[45] While not a high hurdle, it is still the burden of the proponent of the evidence to provide the court with sufficient evidence that the document or writing is what it purports to be.[46] On this record, we find no abuse of discretion in excluding the exhibits for lack of authentication.

### (ii) Hearsay Exception for Business Records

[25,26] Hearsay is not admissible except as provided by the Nebraska Evidence Rules.[47] O'Brien claims the 11 exhibits at issue were admissible under the business records exception to

---

[43] *In re Estate of Radford*, 297 Neb. 748, 901 N.W.2d 261 (2017).

[44] *Id.*

[45] See *Cordray v. 135-80 Travel Plaza, Inc.*, 356 F. Supp. 2d 1011, 1015 n.5 (D. Neb. 2005).

[46] *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008).

[47] *Id.*

the general exclusion of hearsay evidence.[48] The party seeking to admit a business record under § 27-803(5)(a) bears the burden of establishing foundation under a three-part test.[49] First, the proponent must establish that the activity recorded is of a type that regularly occurs in the course of the business' day-to-day activities.[50] Second, the proponent must establish that the record was made as part of a regular business practice at or near the time of the event recorded.[51] Third, the proponent must authenticate the record by a custodian or other qualified witness.[52]

O'Brien directs us to nowhere in the record where he attempted to establish the foundational requirements for showing that any of the 11 exhibits were business records under § 27-803(5). Instead, both before the district court and on appeal, O'Brien argued that because the documents were marked "confidential" by Goodrich and produced during discovery, they must, ipso facto, be treated as Goodrich's business records.

The trial court rejected O'Brien's blanket proposition that anytime a business produces a document marked "confidential" pursuant to a protective order, the document must be allowed to come into evidence as a business record under § 27-803(5). We reject it too.

It was O'Brien's burden, as the party seeking to admit a business record under § 27-803(5)(a), to establish the foundational requirements for such admission.[53] He failed to meet

---

[48] § 27-803(5). See *Arens v. NEBCO, Inc., supra* note 17.

[49] *State v. Robinson*, 272 Neb. 582, 724 N.W.2d 35 (2006), *abrogated on other grounds, State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010). See, also, *Misle v. Misle*, 247 Neb. 592, 529 N.W.2d 54 (1995); *State v. Wright*, 231 Neb. 410, 436 N.W.2d 205 (1989).

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] See *id.*

that burden, and we find no abuse of discretion in excluding these exhibits as hearsay.

### (g) Radar Reconstruction Expert

Before trial, Cessna moved in limine to prohibit O'Brien's radar reconstruction expert from testifying regarding his performance analysis of the accident flight. After an evidentiary hearing, the trial court sustained the motion in limine, finding that O'Brien did not meet his burden to show that the methodology employed by the expert was scientifically reliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[54] and *Schafersman v. Agland Coop.*[55]

Two months later, O'Brien moved for reconsideration of the ruling in limine and asked to supplement the record. The court declined to revisit its preliminary ruling before trial, explaining that O'Brien had been given an opportunity to supplement his evidence before the court's original ruling in limine and was content at the time to rest on the evidence and argument submitted.

On appeal, O'Brien argues it was error for the trial court to exclude the opinion testimony of his radar reconstruction expert. Cessna argues this issue was not preserved for appellate review, because O'Brien failed to make an offer of proof at trial regarding the expert's testimony. The record bears this out.

[27] In order to predicate error upon a ruling of the court refusing to permit a witness to testify, or to answer a specific question, the record must show an offer to prove the facts sought to be elicited.[56] O'Brien does not argue that he made an appropriate offer of proof at trial regarding the opinions he wanted to elicit from his radar reconstruction expert. Rather,

---

[54] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

[55] *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

[56] *State v. Schreiner, supra* note 37.

he suggests the issue was adequately preserved by the district court's ruling in limine. O'Brien is incorrect.

As stated previously, the ruling on a motion in limine is not a final ruling on the admissibility of evidence; the admissibility of evidence which has been the subject of a motion in limine must be raised and preserved for appellate review by an appropriate objection or offer of proof during trial.[57] Because he failed to make an offer of proof at trial regarding the anticipated testimony of the radar reconstruction expert, O'Brien failed to preserve this assigned error for our review.

### 4. CHOICE OF LAW REGARDING PUNITIVE DAMAGES

O'Brien's amended complaint sought to recover punitive damages and alleged that the law of Kansas, rather than Nebraska, applied to that issue. Cessna and Goodrich moved for partial summary judgment on the choice-of-law issue. After an evidentiary hearing, the district court conducted a choice-of-law analysis and concluded that as a matter of law, Nebraska law applied to the issue of punitive damages. O'Brien assigns this as error.

### (a) Standard of Review

[28-30] We will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[58] When there are no factual disputes regarding state contacts, conflict-of-law issues present questions of law.[59] When reviewing questions of law, an appellate court has an obligation to

---

[57] *Id.*

[58] *White v. Busboom*, 297 Neb. 717, 901 N.W.2d 294 (2017).

[59] *Erickson v. U-Haul Internat.*, 278 Neb. 18, 767 N.W.2d 765 (2009); *Heinze v. Heinze*, 274 Neb. 595, 742 N.W.2d 465 (2007).

resolve the questions independently of the conclusion reached by the trial court.[60]

### (b) Nebraska Law Applies to
### Issue of Punitive Damages

[31,32] In answering any choice-of-law question, a court first asks whether there is any real conflict between the laws of the states.[61] An actual conflict exists when a legal issue is resolved differently under the law of two states.[62] The district court found that a conflict existed between Nebraska and Kansas law on the issue of punitive damages. We agree.

[33] Under Nebraska law, "punitive, vindictive, or exemplary damages contravene Neb. Const. art. VII, § 5, and thus are not allowed in this jurisdiction."[63] In contrast, Kansas law allows punitive damages to be awarded for "'malicious, vindictive, or willful and wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs.'"[64]

[34,35] Once a court determines there is a conflict of law between two states, the next step is to classify the nature of the specific conflict issue, "'because different choice-of-law rules apply depending on whether the cause of action sounds in contract or in tort.'"[65] This case involves tort liability, and

---

[60] See *id*.

[61] *In re Estate of Greb*, 288 Neb. 362, 848 N.W.2d 611 (2014).

[62] See *id.*

[63] *Distinctive Printing & Packaging Co. v. Cox*, 232 Neb. 846, 857, 443 N.W.2d 566, 574 (1989), citing *Miller v. Kingsley*, 194 Neb. 123, 230 N.W.2d 472 (1975).

[64] *Adamson v. Bicknell*, 295 Kan. 879, 888, 287 P.3d 274, 280 (2012), quoting *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 837 P.2d 330 (1992).

[65] *Johnson v. United States Fidelity & Guar. Co.*, 269 Neb. 731, 737, 696 N.W.2d 431, 437 (2005) (emphasis omitted), quoting *Buchanan v. Doe*, 246 Va. 67, 431 S.E.2d 289 (1993).

to resolve conflicts of law involving tort liability, this court consistently has applied the Restatement (Second) of Conflict of Laws § 146,[66] which sets out the general rule that "[i]n an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship . . . ."

Section 145 of the Restatement (Second) of Conflict of Laws sets out the "most significant relationship" test and provides that in addition to principles articulated elsewhere in the Restatement,[67] the court should take into account the following contacts:

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.[68]

The Restatement cautions, however, that these contacts are not to be given equal weight mechanically, but should each be considered in light of their relative importance with respect to the particular issue under consideration.[69]

Additionally, because the issue under consideration here involves punitive damages, we note that § 171 of the Restatement (Second) of Conflict of Laws deals specifically with damages. Comment *d.* of § 171 addresses exemplary or punitive damages and directs that "[t]he law selected by

---

[66] Restatement (Second) of Conflict of Laws § 146 (1971). See, *Yoder v. Cotton*, 276 Neb. 954, 758 N.W.2d 630 (2008); *Heinze v. Heinze, supra* note 59; *Malena v. Marriott International*, 264 Neb. 759, 651 N.W.2d 850 (2002).

[67] See Restatement, *supra* note 66, § 6.

[68] *Id.*, § 145(2).

[69] *Id.*

application of the rule of § 145 determines the right to exemplary damages."[70]

As such, under the general rule set forth in § 146 of the Restatement (Second) of Conflict of Laws, Nebraska law will apply to the issue of punitive damages in this case, unless Kansas has a more significant relationship considering the factors in § 145.

Here, the district court began its analysis by noting the parties did not dispute the basic facts about the parties' contacts with Nebraska and Kansas. O'Brien was a Nebraska resident, employed by a Nebraska company flying mail in Nebraska, and he was injured and treated for his injuries in Nebraska. Cessna was headquartered in Kansas, made several design decisions regarding the Caravan models in Kansas, and conducted test flights from Kansas. Goodrich was a New York corporation with its principal place of business in North Carolina.

The district court then analyzed the pertinent sections of the Restatement (Second) of Conflict of Laws, discussed several state and federal cases applying those factors, and considered the undisputed evidence regarding the parties' contacts under the factors in § 145. It ultimately concluded:

> This case has numerous, strong contacts to Nebraska that inform Nebraska's interest in applying its laws to the issue of punitive damages. The injury took place in Nebraska; Plaintiffs are Nebraska residents; . . . O'Brien was flying a regular route within Nebraska at the time of the accident; Suburban Air Freight, the owner of the aircraft and employer of . . . O'Brien, is a Nebraska resident; . . . O'Brien was treated in Nebraska; the Cessna aircraft product at issue was operated at all relevant times within the borders of Nebraska and the alleged product failures took place in this state. . . . Although important decisions and product manufacture took place

---

[70] *Id.*, § 171, comment *d.* at 512.

at the Cessna headquarters in Kansas, the overall weight of the contacts in this case point toward Nebraska having the most significant relationship with this issue. . . . . Given the Cessna aircraft's consistent operation on a Nebraska air route by Nebraska pilots and owners, it is Nebraska that has the most interest in the application of laws to this accident. As Nebraska also has a strong constitutional policy against punitive damages, Nebraska law should be applied to punitive damage claims . . . in this case.

In O'Brien's briefing, he points to nothing in the district court's analysis of the Restatement factors that he claims was incorrect or incomplete. He offers no rationale for applying Kansas law on punitive damages other than to state that "Kansas law should apply because Cessna is based there and its culpable conduct occurred in Kansas."[71] His briefing does not address any of the other Restatement factors. And except for the issue of punitive damages, O'Brien has not argued that Kansas law properly governs any other issue of liability or damages in this tort litigation.

After reviewing the record in light of the applicable Restatement factors, we agree with the district court that the factors predominate in favor of applying Nebraska law to the issue of punitive damages in this case. The trial court did not err in granting summary judgment on this issue of law.

## 5. Jury Instructions

O'Brien assigns error to the jury instructions given in this case. He argues that when instructing the jury on his negligence and strict liability claims, the district court should have used the "statement of the case" instruction O'Brien tendered.[72] We find no error in the district court's refusal of O'Brien's proposed instruction.

---

[71] Replacement brief for appellant at 44.

[72] *Id*. at 25.

### (a) Standard of Review

[36] Whether the jury instructions given by a trial court are correct is a question of law. When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court.[73]

### (b) No Error in Refusing
### O'Brien's Instruction

[37,38] To establish reversible error from a court's failure to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the tendered instruction.[74] Jury instructions do not constitute prejudicial error if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and evidence.[75]

On appeal, O'Brien does not argue that the court's jury instructions incorrectly stated the applicable law. Rather, he complains that the court's burden-of-proof instructions were incomplete, because they did not include each of the specific acts of negligence, or each of the particular design defects, that he described in his pleadings and repeated in his tendered instruction.

At the jury instruction conference, the trial court expressed concern with the length, complexity, and redundancy of O'Brien's proposed instructions. We note O'Brien's proposed statement of the case was 15 pages long; his burden-of-proof section listed 27 ways in which the defendants were negligent and 18 ways in which the Model 208B and its component parts were defectively designed. The district court refused to give O'Brien's tendered instructions and instead drafted its own,

---

[73] *Armstrong v. Clarkson College*, 297 Neb. 595, 901 N.W.2d 1 (2017).

[74] *Tapp v. Blackmore Ranch*, 254 Neb. 40, 575 N.W.2d 341 (1998).

[75] *Golnick v. Callender*, 290 Neb. 395, 860 N.W.2d 180 (2015).

explaining that its goal was to eliminate the redundancy and simplify the issues for the jury, while still allowing the parties to argue all of the claims and defenses that were properly supported by the pleadings and the evidence.

It is unnecessary to individually address each of the specific factual grounds that O'Brien claims the court erroneously omitted from the jury instructions. The essence of his argument on appeal is that his specific allegations of negligence and design defect should have been submitted to the jury in haec verba and that the court's summarization was unfair. We disagree with both contentions.

[39,40] A trial court is not required to submit repetitious allegations of the same act of negligence.[76] This court has consistently condemned the practice of instructing the jury in haec verba and, instead, has placed the duty squarely upon the trial court to properly analyze, summarize, and submit the substance of the numerous allegations of negligence in tort petitions.[77] That is precisely what the district court did here.

Having examined the entire record, we conclude the district court's jury instructions properly analyzed and fairly summarized O'Brien's various theories in accordance with Nebraska law, and did so in a manner which minimized redundancy and still allowed the parties to argue all the theories that were supported by the pleadings and the evidence.

In sum, we reject O'Brien's argument that his tendered instructions should have been used and we conclude that the district court's instructions correctly stated the law, were not misleading, and adequately covered the issues to be submitted to the jury.

---

[76] See, *Davis v. Roosman*, 179 Neb. 808, 140 N.W.2d 639 (1966); *Kroeger v. Safranek*, 165 Neb. 636, 87 N.W.2d 221 (1957).

[77] See, *Foltz v. Northwestern Bell Tel. Co.*, 221 Neb. 201, 376 N.W.2d 301 (1985); *Greenberg v. Bishop Clarkson Memorial Hosp.*, 201 Neb. 215, 266 N.W.2d 902 (1978); *Marquardt v. Nehawka Farmers Coop. Co.*, 186 Neb. 494, 184 N.W.2d 617 (1971).

### 6. Taxation of Costs

After the jury returned its verdict for the defendants, the court accepted the verdict and entered judgment thereon, directing O'Brien to "pay costs of [the] action." Six days later, Cessna moved for an award of costs in the sum of $124,424.39.

O'Brien argued Cessna's motion for costs was untimely, because it was filed 6 days after the court accepted the jury's verdict and entered judgment thereon. The district court disagreed and found Cessna's motion was timely. It noted that its earlier judgment ordered O'Brien to pay costs but did not specify an amount, and it construed Cessna's motion alternatively either as a motion to calculate those costs or as a motion to alter or amend the judgment to include a specific award of costs.[78]

After an evidentiary hearing and briefing, the court entered an order awarding Cessna some of its deposition costs and subpoena fees in the total amount of $35,701.68. The court's order recited the applicable law and included an itemized list of the deposition costs found to be recoverable.

On appeal, O'Brien assigns error to the court's award of costs. His primary argument is that the motion for costs was untimely, but he also suggests it was error to tax costs associated with certain depositions. We address both arguments below, and we find neither has merit.

### (a) Standard of Review

[41] The decision of a trial court regarding taxing of costs is reviewed for an abuse of discretion.[79] An abuse of discretion occurs when the trial judge's reasons or rulings are clearly untenable, unfairly depriving a litigant of a

---

[78] See Neb. Rev. Stat. § 25-1329 (Reissue 2016).

[79] *Mock v. Neumeister*, 296 Neb. 376, 892 N.W.2d 569 (2017); *City of Falls City v. Nebraska Mun. Power Pool*, 281 Neb. 230, 795 N.W.2d 256 (2011).

substantial right and denying just results in matters submitted for disposition.[80]

### (b) No Error in Awarding Costs

[42,43] We have long held that the costs of litigation and expenses incident to litigation may not be recovered unless provided by statute or a uniform course of procedure.[81] In this case, the court awarded costs pursuant to Neb. Rev. Stat. § 25-1710 (Reissue 2016).[82] Under that statute, a successful defendant in a tort action is ordinarily entitled to an award of costs as a matter of course "upon a judgment in his favor."[83]

### (i) Motion for Costs Was Timely

O'Brien argues Cessna's motion for costs was untimely under this court's holding in *Salkin v. Jacobsen*.[84] In *Salkin*, we held that the defendant, who was seeking an award of attorney fees on the ground the plaintiff's action had been dismissed as frivolous,[85] had not timely filed his motion before the entry of judgment. We reasoned that attorney fees, where recoverable, are treated as an element of court costs, and we further reasoned that an award of costs in a judgment is considered part of the judgment. We then held that one seeking an award of attorney fees from the trial court pursuant to § 25-824 must make such a request before judgment is entered.

*Salkin* did not address the timeliness of a motion for costs under § 25-1710. Nor does the language of § 25-1710 address when any such motion must be filed, directing instead that "[c]osts shall be allowed of course to any defendant upon

---

[80] *Holden v. Wal-Mart Stores, supra* note 29.

[81] See *City of Falls City v. Nebraska Mun. Power Pool, supra* note 79.

[82] See *Bunnell v. Burlington Northern RR. Co.*, 247 Neb. 743, 530 N.W.2d 230 (1995).

[83] See *Rehn v. Bingaman*, 152 Neb. 171, 173, 40 N.W.2d 673, 675 (1950), citing § 25-1710.

[84] *Salkin v. Jacobsen*, 263 Neb. 521, 641 N.W.2d 356 (2002).

[85] See Neb. Rev. Stat. § 25-824 (Reissue 2016).

a judgment in his favor in the actions mentioned in section 25-1708." A similar statute provides that costs "shall be allowed of course" to prevailing plaintiffs.[86]

As a practical matter, it is unlikely that a plaintiff or defendant will file a motion seeking costs in the trial court before judgment is entered in their favor. And while we do not endorse the practice, we note it is not uncommon for trial courts, when entering judgment on a jury verdict, to award unspecified "costs" to the prevailing party without identifying or calculating the amount.

Here, the district court's judgment expressly directed O'Brien to pay costs of the action, but did not specify the amount of such costs. O'Brien's argument that the motion for costs was untimely is premised on the conclusion that the judgment awarding unspecified costs was final and appealable. We express no opinion on whether a purported judgment that includes an award of unspecified costs can be considered a judgment under Neb. Rev. Stat. § 25-1301 (Reissue 2016), but on this record, we find no abuse of discretion in the district court's conclusion that Cessna's motion for specific costs was timely.

Like the district court, we construe Cessna's subsequent motion for costs either as a motion seeking to modify the award of unspecified costs previously awarded or as a motion to alter or amend the judgment purporting to award unspecified costs. Whether construed as a motion to modify under Neb. Rev. Stat. § 25-2001 (Reissue 2016) or a as a motion to alter or amend under § 25-1329, we conclude that Cessna's motion, filed 6 days after the court entered a judgment that included unspecified costs, was timely filed.

### (ii) No Abuse of Discretion in Awarding Deposition Costs

[44,45] O'Brien's briefing challenges only that portion of the court's award pertaining to deposition costs. It is well

---

[86] Neb. Rev. Stat. § 25-1708 (Reissue 2016).

established that deposition costs are properly taxable and recoverable under § 25-1710.[87] Moreover, we have explained that "'""unless it appears that the depositions were not taken in good faith or were actually unnecessary, costs of taking them are properly taxable,"'"" even if the depositions were not used at trial.[88] The questions of good faith and reasonable necessity are for the trial court to determine, bearing in mind that a deposition may appear necessary when taken, but "'""afterward the case may take such a course as to make it unnecessary to use the deposition."'""[89]

Here, the district court determined that Cessna should recover the reasonable costs to prepare the original transcripts of the depositions along with the court reporter appearance fees, but did not allow recovery of the costs associated with videotaping and editing the depositions. The court also declined to award deposition costs when the invoices were not sufficiently detailed, and in several instances, it prorated costs for depositions that took longer than the court's protective orders permitted.

On this record, we find the district court provided a reasoned and logical explanation for the manner in which it taxed costs under § 25-1710. It did not abuse its discretion, and O'Brien's assignment to the contrary is without merit.

## V. CONCLUSION

For the reasons set forth herein, we find no merit to any of O'Brien's assigned errors and affirm the judgment of the district court.

Affirmed.

Wright, J., not participating.

---

[87] *Bunnell v. Burlington Northern RR. Co., supra* note 82.

[88] *Stocker v. Wells*, 155 Neb. 472, 478, 52 N.W.2d 284, 287 (1952).

[89] *Id.*